*Exhibit A*

(3) at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

(4) while the agreement was in effect, a person or persons who had joined in the agreement knowingly did one or more acts for the purpose of carrying out or carrying forward the agreement.

4. **FACTS**:

*Summary of Investigation*

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

During the time period alleged in the Indictment, in the Eastern District of Missouri, and elsewhere, defendant **Richard GROSS** along with his co-defendants and others, entered into an agreement or understanding with his co-defendants and others to commit a number of federal offenses: 1) to distribute and possess with the intent to distribute Schedule I controlled substances and Schedule I controlled substance analogues intended for human consumption; 2) to defraud and mislead, and to introduce misbranded drugs into interstate commerce; 3) to import Schedule I controlled substances and Schedule I controlled substance analogues intended for human consumption into the United States from a place outside thereof; and 4) to receive, conceal, sell and facilitate the transportation of merchandise after importation, knowing the same to have been imported with false, forged or fraudulent invoice or other document or paper.

*Details of Investigation*

In recent years, individuals began to manufacture and traffic in smokable synthetic cannabinoid products, many times known on the street as "K2," "Spice," "Incense," "Potpourri" and "Herbal Sachet" products. Users of these products have reported effects including, but not

8

limited to, paranoia, panic attacks, increased heart rate and increased blood pressure. Smokable synthetic cannabinoid products are a mixture of an organic "carrier" medium, such as the herb-like substance (i.e. Damiana), which is then typically sprayed or mixed with a synthetic compound containing a Schedule I Controlled Substance or Schedule I Controlled Substance Analogue intended for human consumption. Currently, there are hundreds of synthetic cannabinoid compounds.

The defendant admits that in response to the scheduling of the aforementioned compounds in paragraph 2 herein, and in an attempt to circumvent newly enacted federal laws, as well as state laws, individuals including himself and his co-defendants in the instant indictment began manufacturing and distributing synthetic cannabinoid and cathinone products. These products had a substantially similar chemical structure and pharmacological effects on the central nervous system as Schedule I controlled substances. Furthermore, individuals, including defendant **RICHARD GROSS** (hereinafter **"GROSS"**) and his co-defendants, and others, began labeling the products as "not for human consumption," in direct response to the Controlled Substance Analogue Enforcement Act's reference to a controlled substance analogue being intended "for human consumption."

The evidence will show Pamela TABATT owned two stores in the Eastern District of Missouri, South 94, LLC (hereinafter "South 94") and Smoke Sensations, LLC (hereinafter "Smoke Sensations"). TABATT was listed as the registered agent for South 94, and co-defendant Paul BERRA was listed as one of the organizers for SOUTH 94. On April 23, 2010, the registration for SMOKE SENSATIONS was filed. TABATT was listed as the registered agent and sole organizer. On May 31, 2010, the registration for **STRICTLY WHOLESALE** was filed on May 31, 2010, as a Limited Liability Company in the State of Missouri. Co-

defendant BERRA was listed as the Registered Agent.

Beginning in 2012, multiple federal agencies including, but not limited to, the Internal Revenue Service Criminal Investigation, Drug Enforcement Administration, ICE Homeland Security Investigations and the United States Postal Inspection Service began an investigation concerning **GROSS**, TABATT, and BERRA for manufacturing, marketing, and distributing controlled substances and controlled substance analogues in the Eastern District of Missouri, and elsewhere. TABATT is the mother of defendant **GROSS**. **GROSS** and BERRA d/b/a **STRICTLY WHOLESALE** would manufacture and market their synthetic drugs to TABATT. **GROSS** and BERRA would package these drugs in packages for distribution. The packages did not contain any information pertaining to the ingredients, directions for usage and did not bear any labels containing the name and place of the business, the manufacturer, packer and/or distributor. Additionally, the labeling did not include warnings against unsafe dosages, methods, or durations of administration or application. **GROSS** was aware that individuals were ingesting these products to get high.

Knowing the nature of these substances, **GROSS** and BERRA would ship and transport these substances to TABATT to sell at SOUTH 94 and SMOKE SENSATIONS. Also knowing the nature of these substances, TABATT distributed these drugs from her stores, SMOKE SENSATIONS and SOUTH 94 which were located within the Eastern District of Missouri. TABATT's stores sold synthetic controlled substances to customers including but not limited to the following products manufactured by defendant **GROSS**: "Fresh," "Limited," "Twisted", "Starry Nights", "MD5 Premium Herbal Incense", "1 Hit Homegrown Supercense", and "1 Hit Gateway Madness Supercense."

Between October 2012 and August 2013, officers conducted multiple undercover

10

purchases of these drugs from SMOKE SENSATIONS and SOUTH 94. Laboratory results revealed that the aforementioned packages purchased from TABATT's businesses contained, but were not limited to, AM-2201, Pentedrone, MDPV, alpha-PVP, 5-MeO-DALT, UR-144 and XLR11. All of these substances were either controlled substances or controlled substance analogues intended for human consumption. Customers and law enforcement purchased these synthetic controlled substances for approximately $10 per gram in multiple gram packages (cannabinoids), $40 per half gram (cathinones), and $75 per gram (cathinones).

On April 24, 2012, a shipment of 1,034.004 grams of a-PVP was intercepted by U.S. Customs in San Francisco, CA. The recipient of the package was BERRA, at 25333 Cheyenne Lane, Warrenton, Missouri. The sender of the package was an unknown name and address and China. The parcel which was declared as "detergent powder" contained powder which was located inside an aluminum foil. That powder was tested and confirmed to be a-pvp which was a controlled substance analogue intended for human consumption. Two other shipments were intercepted by Customs which also contained controlled substance analogues under false invoice or documentation. Records seized during the course of the investigation establish that defendant Gross and co-defendant Berra placed orders for and received shipments of controlled substance analogues from China.

In January 2013, investigators interviewed a Source of Information ("SOI") who was a former employee of **SMOKE SENSATIONS**. The SOI stated that **SMOKE SENSATIONS** sold synthetic cathinones named "Wicked," "Twisted" and "Fresh." The SOI explained that "Fresh" sold for $75.00 per gram. The SOI advised that co-defendant GROSS was the manufacturer and transporter of "Fresh." The SOI further stated that everyone, including TABATT, knew the customers were using the synthetic cathinones to get high. The SOI stated

11

that he/she had personal knowledge about end of the week cash drops made to TABATT's residence in excess of $65,000. This did not include the money that was left at the store in the safe. The SOI further stated that TABATT kept her cash in a safe at her house. Subsequent analysis of "Fresh" revealed that it contained Pentedrone and a-PVP which are controlled substances or controlled substance analogues intended for human consumption.

In March 2013, St. Louis County Police conducted numerous traffic stops of individuals who were found in possession of synthetic drugs purchased from Smoke Sensations including "Fresh" or "Fresh2". Many of these individuals indicated that they used the synthetics to get high and at least one the individuals referred to the synthetics as "drugs." Individuals advised officers that they generally paid $80.00 for "Fresh." They also explained they had to use the correct terminology with the clerks to obtain the items, such as "F" for "Fresh. These synthetics contained Pentedrone, a-PVP, and/or MDPV, all of which were controlled substance analogues intended for human consumption.

In September 2013, a federal search warrant was executed at the residence of defendant **GROSS.** Among the items seized was a Toshiba laptop belonging to **GROSS.** Detective Patrick Wilds, a qualified forensic examiner with the Regional Computer Education and Enforcement Group, examined the Toshiba laptop. Various files of interest were recovered including a pdf document entitled, "things to research further." In this text document, was a description of MDMA and other recreational drugs and their effects. In addition, Det. Wilds located a pdf document entitled, "things to remember for future research" which included a description of a chemical called Methoxetamine and an explanation which read, "as its [sic] an analogue to Ketamine, which is a schedule III, the Analog Act would not apply as it only applies to schedule 1 & 2 drugs." In addition, to the research conducted by **GROSS** on the laptop, Det.

Wilds also located a Schedule 3 list, numerous financial records of **STRICTLY WHOLESALE** including sales history, a saved document outlining the July 2012 federal ban of controlled substance analogues intended for human consumption, and a document saved as "FDA bullshit" which was a guide for industry botanical drug products authored by the U.S. Department of Health and Human Services. An analysis of **GROSS's** computer and internet usage demonstrates **GROSS's** monitoring and awareness of the federal drug laws. Additional items seized included labels for synthetic products, a bagging machine, receipts for the sale of synthetic products by Strictly Wholesale and paperwork associated with the order of chemicals to be utilized in the manufacturing of synthetic drugs.

In October 1, 2016, pursuant to a consent to search, law enforcement agents searched a trailer and various buildings located on property owned by Strictly Wholesale in Carrolton, Illinois. Items seized included equipment for the manufacturing of synthetic drugs including cement mixers, empty cans of acetone, and sprayers. Additionally, labels and packaging material relating to the distribution of synthetic drug products were located.

In October 2013, **GROSS** was interviewed by investigators and admitted that he had been involved with BERRA and their business, **STRICTLY WHOLESALE** from the beginning of 2013. GROSS stated that he was initially in charge of conducting research for the business to stay abreast of the constantly changing chemicals that were being banned under federal law, but he eventually took care of all of the financial and administrative aspects associated with **STRICTLY WHOLESALE. GROSS** advised that he and BERRA received the chemicals used to create the controlled substances from China and the UK. Also, GROSS stated that the international shipments of chemicals were initiated by BERRA. He admitted that Strictly Wholesale produced "Fresh" (synthetic cathinone), and "K2" (synthetic cannabinoids) at the

13

company's property located at Rural Route 2 in Carrollton, Illinois. **GROSS** also made money transfers between bank accounts associated with **STRICTLY WHOLESALE** and the supply companies from which they ordered. Moreover, **GROSS** admitted that defendant TABATT was **STRICTLY WHOLESALE's** biggest customer of their synthetic controlled substances business. In September 2013, TABATT was interviewed and admitted that she had previously purchased "Fresh" from **STRICTLY WHOLESALE** for her business SMOKE SENSATIONS. "Fresh" was previously tested and found to contain Pentedrone and a-PVP, controlled substance analogues intended for human consumption.

In January 2014, investigators received information that SMOKE SENSATIONS was continuing to sell controlled substances and controlled substance analogues intended for human consumption. An individual advised officers that he/she had called SMOKE SENSATIONS and asked, "is it cool if we come down." Upon receiving an affirmation, this individual went to SMOKE SENSATIONS. The individual made contact with the clerk and asked, "can I get one of them?" The clerk then retrieved a package of "Fresh" from behind the back wall and sold it to the individual. This individual explained to investigators that he/she had previously injected himself/herself with "Fresh" and explained the effects were similar to methamphetamine or cocaine. This item was later tested by a lab and found to contain a-PVP which was a controlled substance analogue intended for human consumption.

The amount of Schedule I controlled substances and/or controlled substance analogues intended for human consumption, in light of the known evidence and seizures, has not been agreed to by the parties. A preliminary determination by the Government reflects that the amount of controlled substances and/or controlled substance analogues intended for human consumption converted into marijuana for purposes of advisory sentencing guideline calculations

14